[No. B201509. Second Dist., Div. Seven. Dec. 22, 2008.]

SARKIS GHAZARYAN, Plaintiff and Appellant, v.
DIVA LIMOUSINE, LTD., Defendant and Respondent.

**COUNSEL**

Arias Ozzello & Gignac, H. Scott Leviant, Mike Arias, Mark A. Ozzello, Mikael Stahle and Jason E. Barsanti for Plaintiff and Appellant.

Law Offices of David W. Affeld and David W. Affeld for Defendant and Respondent.

**OPINION**

**PERLUSS, P. J.**—Sarkis Ghazaryan appeals from the trial court's order denying his motion to certify a class of limousine drivers allegedly undercompensated by Diva Limousine, Ltd. (Diva), in violation of California wage and hour laws. Ghazaryan's lawsuit contests Diva's policy of paying its drivers an hourly rate for assigned trips but failing to pay for on-call time between assignments (referred to by Diva employees as "gap time"). Because the trial court incorrectly focused on the potential difficulty of assessing the

validity of Diva's compensation policy in light of variations in how drivers spend their gap time, we reverse the court's denial of the motion and remand with directions to certify Ghazaryan's two proposed subclasses.

## FACTUAL AND PROCEDURAL BACKGROUND

Diva operates a limousine service in the greater Los Angeles area. At the time Ghazaryan filed his class certification motion in May 2006, Diva indicated it had employed approximately 190 drivers during the previous four years; approximately 100 still worked for the company. On any given day Diva places between 40 and 45 drivers in the field, and those drivers are dispatched on 140 to 150 trips or runs.[1] However, the number of trips can fluctuate between 100 on a slow day and more than 200 on days when special events occur (for example, the Academy Awards).

Typically, Diva notifies drivers of their first few assignments before their shift begins in part to allow them to plan their gap time. Approximately 75 percent of Diva's drivers have permission to take their Diva vehicles home and commute to their first run using their Diva vehicles. After these initial runs have been completed, drivers are assigned by the dispatcher to additional trips according to location, availability and fairness among drivers. On a busy day a driver may receive six to eight assignments. On a slow day that number often falls below five trips. Drivers have no way of predicting the length of any particular period of gap time although, on occasion, dispatchers may accommodate requests to schedule assignments around the drivers' personal appointments. According to anecdotal and statistical estimates submitted by both sides, it is clear drivers were placed on call daily for substantial periods of time.

Ghazaryan was employed by Diva as a full-time shift driver for more than five years. Diva concedes Ghazaryan was a hard-working employee who asked for as many assignments as available. Notwithstanding his readiness to accept all assignments offered by Diva's dispatchers, Ghazaryan frequently had significant periods of on-call time between assignments. During that gap time Ghazaryan understood he was not allowed to use his vehicle for personal use (a policy set forth in the official "Chauffeur's Handbook" provided by Diva) and was required to stay near the vehicle (to be available for assignments) and to remain in uniform.[2] Drivers were also required to

---

[1] Diva estimates approximately 70 percent of its assignments are airport transfers.

[2] As Diva frequently reminded its drivers in the weekly bulletins it issued to them, the handbook governed drivers' duties and responsibilities.

utilize gap time for their mandatory rest and lunch breaks, which could be interrupted if dispatched on an assignment. After an incident in which a dispatcher required Ghazaryan to cancel his lunch order and accept an assignment, Diva management personnel instructed Ghazaryan he was to remain available for assignments from dispatch while on call and was not permitted to refuse them. Diva also required drivers to refuel or clean their vehicles as necessary between assignments using Diva's own facility or one of several predetermined gas stations or carwashes. Diva monitored its vehicles, including their unauthorized use or location, through GPS transmitters.

Ghazaryan filed his lawsuit in May 2006 alleging Diva by its practice of paying drivers by the job, not by the hour, had failed to pay earned wages and overtime or to provide required rest breaks and meal periods in violation of multiple provisions of the Labor Code and implementing administrative regulations.[3] He further also alleged Diva had engaged in unlawful business practices under Business and Professions Code section 17200 et seq. Although Ghazaryan's complaint originally identified one broad class with four subclasses, his motion sought to certify only two overlapping subclasses: (1) based on Diva's alleged failure to pay earned overtime and straight time, "All current and former employees of Defendant who worked as Limousine Drivers during the period of May 10, 2002 to the present"; and (2) targeting Diva's failure to provide mandatory rest breaks, "All current and former employees of Defendant who work as Limousine Drivers at any time during the period of May 10, 2002 to the present, worked one or more four-hour increments of time without being given a rest break for each such increment and who were not properly compensated therefor[]."

Diva opposed class certification principally because of the purported difficulties in identifying eligible members of the class and assessing the validity of Diva's compensation policy as applied to different drivers who may or may not have used their gap time for personal pursuits. Diva explained it has several categories of drivers, some of whom are paid for gap time. Thus, dedicated event drivers, L'Ermitage Hotel drivers and organ transplant drivers are paid on a strictly hourly basis including any on-call time. Diva also submitted declarations from a number of drivers who typically use unpaid gap time for their own purposes, such as working out at

---

[3] In his first amended complaint, the operative complaint here, Ghazaryan alleged Diva had failed to pay overtime compensation (Lab. Code, §§ 1194, 1198), failed to pay wages (Cal. Code Regs., tit. 8, § 11090, subd. 2(G)), failed to provide meal periods (Lab. Code, §§ 226.7, 512), failed to provide rest breaks (Lab. Code, §§ 226.7, 512), failed to timely pay wages (Lab. Code, §§ 201, 202 & 203) and failed to provide itemized statements (Lab. Code, § 226).

the gym, napping or eating at home or running personal errands. Several of those drivers stated they are not in favor of Ghazaryan's lawsuit and do not want Diva to change the way it compensates its drivers.

The trial court found these declarations convincing and denied the motion on the ground certification would raise too many individualized issues. Ghazaryan filed a timely notice of appeal.[4] (See *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27].)

## DISCUSSION

### 1. *The Standard for Review of a Class Certification Order*

Class actions are statutorily authorized "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." (Code Civ. Proc., § 382.) A trial court is generally afforded great latitude in granting or denying class certification, and we normally review a ruling on certification for an abuse of discretion. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326–327 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On Drug Stores*).) This deferential standard of review, however, is inapplicable if the trial court has evaluated class certification using improper criteria or an incorrect legal analysis: "[A] trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made . . . .' " (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at pp. 435–436; accord, *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 575–576 [67 Cal.Rptr.3d 468, 169 P.3d 889]; *Sav-On Drug Stores,* at pp. 326–327; see *Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828–829 [97 Cal.Rptr.2d 226] ["[i]f the trial court failed to follow the correct legal analysis when deciding whether to certify a class action, 'an appellate court is required to reverse . . . "even though there may be substantial evidence to support the court's order" ' "].)

### 2. *The Trial Court Utilized Improper Criteria in Analyzing Ghazaryan's Motion*

The trial court's order denying certification suggests, if Ghazaryan's claims are valid, class treatment of those claims is appropriate. Thus, under the

---

[4] At the hearing on the motion Ghazaryan's counsel sought an indication from the court as to how the class definition might be modified to meet the court's concerns. The court declined to offer any suggestions and pointed out Ghazaryan could seek relief on appeal.

caption "numerosity" the court stated, "If all the employees were on-the-clock [during their on-call time] and not paid, then the proposed class would be ascertainable and then probably numerous. However, here it would be necessary to first determine an ultimate issue in the case, which this Court cannot do to determine the class." Similarly, as to ascertainability the court asserted, "The Court first must . . . determine if Diva's practices are improper and, if so, which drivers fit into an appropriate class."

The trial court is, of course, correct, under well-established Supreme Court authority: "The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' " (*Sav-On Drug Stores, supra*, 34 Cal.4th at p. 326.) But the trial court fundamentally misconceived the import of the rule against evaluating the merits of a plaintiff's claims in deciding whether class treatment is appropriate. Rather than denying certification because it cannot reach the merits, as the court did here, the trial court must evaluate whether the theory of recovery advanced by the plaintiff is likely to prove amenable to class treatment: "As the focus in a certification dispute is on what type of questions—common or individual—are likely to arise in the action, rather than on the merits of the case [citations], in determining whether there is substantial evidence to support a trial court's certification order, [the reviewing court] consider[s] whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Id.* at p. 327.)

### a. *Ascertainability and numerosity*

■ Having begun its analysis of Ghazaryan's motion from the improper assumption the class could not be certified if the underlying conduct had not yet been shown to be illegal, the trial court offered, in concluding the class proposed by Ghazaryan was not properly ascertainable,[5] the legally correct but factually inapposite statement, "It is error to certify a class if that class is defined in terms of ultimate liability questions." As this court explained in *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908 [107 Cal.Rptr.2d 761], a class is properly defined in terms of "objective characteristics and common transactional facts," not by identifying the ultimate facts that will establish liability. (*Id.* at p. 915.) This is precisely what Ghazaryan has done.

---

[5] The court made no express finding on numerosity based on its incorrect finding the class was not ascertainable. Numerosity is not contested in this appeal. Because we conclude the proposed subclasses are ascertainable (and include as many as 190 current and former employees), we likewise conclude Ghazaryan has satisfied the numerosity requirement.

Ghazaryan's proposed class (referred to without explanation or need as a "subclass") consists of all drivers employed by Diva during a specific period of time, a class of persons already identified by Diva through computerized employment records.[6] Diva argues this class includes drivers who were paid for their on-call time as dedicated event drivers, L'Ermitage Hotel drivers or organ transplant drivers. Yet the existence of these separate assignments in no way renders Ghazaryan's proposed class unascertainable. If some drivers worked exclusively in one of these categories, they can simply be excluded from recovery if liability is ultimately found. Alternatively, the class can be modified to specify only those drivers who were not paid for their on-call or gap time. This modification may not even be necessary if, as we suspect, few Diva drivers fall exclusively into a single category. As one of Diva's dispatchers stated in his declaration, "What a driver does varies each day for each individual chauffeur. . . . These driver categories are not carved in stone." Based on this statement, it would appear virtually all Diva drivers have, at some point during the relevant time period, accumulated some unpaid on-call time.[7]

■ Under these circumstances, therefore, the gap-time class definition proposed by Ghazaryan was neither inaccurate nor elusive. As we have previously explained, " ' "[c]lass members are 'ascertainable' where they may be readily identified without unreasonable expense or time by reference to official records." ' " (*Lee v. Dynamex, Inc.* (2008) 166 Cal.App.4th 1325, 1334 [83 Cal.Rptr.3d 241]; see also *Hicks v. Kaufman & Broad Home Corp., supra,* 89 Cal.App.4th at p. 914 ["[a]scertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata"].)

■ Diva also argues the proposed class is not ascertainable because determination of the legality of Diva's policy, as well as damages flowing from any illegality, would require highly individualized assessments resulting

---

[6] We see no need to address at length the second proposed subclass of Diva drivers who were required to take rest breaks while on call. Diva admits it expects drivers to take rest breaks during their gap time. While there may be a hypothetical distinction between those drivers who accumulated unpaid gap time and those who did not receive prescribed rest breaks, in practice there appears to be a nearly complete overlap of the two subclasses. In any event, both subclasses are fully ascertainable.

[7] Elsewhere, the dispatcher acknowledged only two drivers were regularly assigned to work at L'Ermitage Hotel and one of those two, the driver assigned to work weekends at the hotel, completed his weekly hours by working as a shift driver subject to the same compensation scheme as other shift drivers. As for the category of event drivers whose on-call time was paid, Diva acknowledged it only employs about 10 drivers who are dedicated event drivers and commonly places all drivers, including shift drivers like Ghazaryan, on call for certain large events.

from variations in the amount of each driver's accumulated gap time and his or her use of that time. But this objection is simply not relevant to the question of the ascertainability of the proposed class. In *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 14 [64 Cal.Rptr.3d 327], Division One of this court rejected FedEx's contention "the members of [the proposed] class shifted 'in and out, sometimes on a day-to-day basis . . . .' " "The class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on the description." (*Ibid.*; see also *Sav-On Drug Stores, supra*, 34 Cal.4th at p. 333 [" 'a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery . . .' "]; *Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208 [76 Cal.Rptr.3d 804] [class of employees ascertainable in spite of absence of specific rest period records; "speculation that goes to the merits of ultimate recovery[ is] an inappropriate focus for the ascertainability inquiry"]; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 743 [9 Cal.Rptr.3d 544] [class of all employees in certain job categories ascertainable even though some employees may not have worked overtime and thus may not be entitled to any recovery].)[8]

Because the purpose of the ascertainability requirement is to ensure notice to potential class members who at some time during their employment by Diva accumulated gap time, the proposed subclass consisting of all Diva drivers would simply and effectively accomplish this purpose.

### b. *Community of interest*

The trial court also rejected Ghazaryan's attempt to establish he shared a community of interest with similarly situated Diva employees. While

---

[8] It is true class certification can be denied for lack of ascertainability when the proposed definition is overbroad and the plaintiff offers no means by which only those class members who have claims can be identified from those who should not be included in the class. (*Akkerman v. Mecta Corp., Inc.* (2007) 152 Cal.App.4th 1094, 1100–1101 [62 Cal.Rptr.3d 39] [class defined as all patients in California who received electroconvulsive therapy with defendant's device is overbroad when the claim is for insufficient warnings and there is no way to determine which patients relied on defendant's warnings as opposed to those provided by their physicians or consent forms].) However, class certification should not be denied on overbreadth grounds when the class definition is only slightly overinclusive. (*Sav-On Drug Stores, supra*, 34 Cal.4th at p. 337 [no bar to certification on the assumption that, despite defendant's common practices, some members of the class were not harmed]; *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 136 [50 Cal.Rptr.3d 135] [ascertainability is not defeated if the class may be overinclusive; nonmembers can be eliminated from the class at a later date]; *Bell v. Farmers Ins. Exchange, supra*, 115 Cal.App.4th at p. 743 [that 5.7 percent of class members lack an interest in the objectives of the litigation is a "marginal element" that does not "make the class less ascertainable"].)

the focus of the ascertainability requirement is to ensure notice of the action is received by putative class members as to whom the judgment in the action will be res judicata, "[c]ommon questions of law and fact are required in order to assure the interests of the litigants and the court are furthered by permitting the suit to proceed as a class action 'rather than in a multiplicity of separate suits.'" (*Hicks v. Kaufman & Broad Home Corp., supra,* 89 Cal.App.4th at p. 914.) "The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Sav-On Drug Stores, supra,* 34 Cal.4th at p. 326; accord, *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 [56 Cal.Rptr.3d 861, 155 P.3d 268].) "Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing." (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 435; see *Prince v. CLS Transportation, Inc.* (2004) 118 Cal.App.4th 1320, 1324 [13 Cal.Rptr.3d 725].)

Diva contended, and the trial court agreed, Ghazaryan did not satisfy the community of interest requirement because of the inherent differences among employees in the amount of gap time accumulated and how that time was spent, issues Diva argues are highly relevant to the question whether gap time should be compensable in the first place and, if so, the quantum of any particular driver's damages.

Determining whether a sufficient community of interest exists to warrant class certification, however, depends not on the differences among individual drivers' use of their gap time but on the reasonableness of Diva's policies as applied to its drivers as a whole. Under California law the Industrial Welfare Commission (IWC) "is . . . empowered to formulate regulations (known as wage orders) governing employment in the State of California," and the Division of Labor Standards Enforcement (DLSE) "is . . . empowered to enforce California's labor laws, including IWC wage orders." (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 561–562 [59 Cal.Rptr.2d 186, 927 P.2d 296].) The question whether an employer is obligated to pay overtime compensation for on-call shifts depends on interpretation of the term "hours worked" contained in IWC's wage order No. 9, codified in California Code of Regulations, title 8, section 11090, subdivision 2(G). This provision defines "hours worked" as "the time during which

an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."[9]

In response to specific employer inquiries about the term "hours worked," the DLSE has issued several advice letters, which, " ' "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " (*Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 815 [105 Cal.Rptr.2d 59].) One such advice letter, issued on March 31, 1993, acknowledges the inquiry is "highly fact-driven," but "[t]he bottom line consideration is the amount of 'control' exercised by the employer over the activities of the worker. . . . [I]mmediate control by the employer which is for the benefit of the employer must be compensated." In a subsequent advice letter dated December 28, 1998, the DLSE summarized the factors relevant to this inquiry: "1. Whether there are excessive geographic restrictions on the employee's movements[;] [¶] 2. Whether the frequency of calls is unduly restrictive[;] [¶] 3. Whether a fixed time limit for response is unduly restrictive[;] [¶] 4. Whether the on-call employee can easily trade his or her on-call responsibilities with another employee[;] and [¶] 5. Whether and to what extent the employee engages in personal activities during on-call periods."[10]

---

[9] The IWC has promulgated 15 orders covering specific industries and occupations. Wage order No. 9 applies to the transportation industry. All wage orders contain the same definition of "hours worked" as does wage order No. 9, though two wage orders contain additional language. (See *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581 [94 Cal.Rptr.2d 3, 995 P.2d 139]; *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 25 [285 Cal.Rptr. 515].)

[10] The DLSE derived these factors from the multifactor test enunciated by the Ninth Circuit Court of Appeals in *Berry v. County of Sonoma* (9th Cir. 1994) 30 F.3d 1174. The *Berry* court observed that "[t]he proper inquiry is 'whether [an employee] is so restricted during on-call hours as to be effectively engaged to wait.' " (*Id.* at p. 1182; cf. *Madera Police Officers Assn. v. City of Madera* (1984) 36 Cal.3d 403, 409 [204 Cal.Rptr. 422, 682 P.2d 1087] [adopting a two-step analysis in considering police officers' right to compensation for off-duty time: "We first examine whether the restrictions on off-duty time are primarily directed toward the fulfillment of the employer's requirements and policies. Second, we analyze whether the employees' off-duty time is so substantially restricted that they are unable to engage in private pursuits."].)

As noted in its March 31, 1993 letter, the DLSE declined to defer entirely to the corresponding federal standard under the Fair Labor Standards Act of 1938, title 29 of the United States Code section 201 et seq., because, under California law "the existence of an 'agreement' regarding the understanding of the parties [as to the compensation policy] is of no importance. The ultimate consideration in applying the California law is determining the extent of the 'control' exercised."

The record before the trial court on the class certification motion established, as Diva asserts, that individual drivers accumulate gap time at varying rates[11] and utilize that time in different ways. But the record also reveals Diva dictates to a large extent how drivers use their on-call time. Diva distributes an official "Chauffeur's Handbook" to all drivers, which expressly bars personal use by drivers of Diva's vehicles (albeit Diva appears to ignore incidental errands within a geographically proximate area), requires drivers to respond promptly to dispatch calls and accept trip assignments absent prearranged circumstances, requires drivers to be in full uniform while in or proximate to their vehicles, and requires drivers to clean and maintain their vehicles during their on-call time. Those limitations apply across the board to all drivers who have on-call time during the course of a day. Although individual testimony may be relevant to determine whether these policies unduly restrict the ability of drivers as a whole to utilize their on-call time for personal purposes, the legal question to be resolved is not an individual one. To the contrary, the common legal question remains the overall impact of Diva's policies on its drivers, not whether any one driver, through the incidental convenience of having a home or gym nearby to spend his or her gap time, successfully finds a way to utilize that time for his or her own purposes.

The distinction is illustrated by *Silva v. Block* (1996) 49 Cal.App.4th 345 [56 Cal.Rptr.2d 613] (*Silva*) and *Prince v. CLS Transportation, Inc., supra,* 118 Cal.App.4th 1320. In *Silva* the proposed class consisted "of people wrongly and unjustifiably attacked by police dogs used by the Sheriff's Department," plus "a minority subclass comprised of all individuals belonging to racial minorities who had suffered such attacks." (*Silva*, at p. 348.) Division Two of this court affirmed an order sustaining a demurrer to the class allegations in the complaint because it was apparent from the face of the pleading that issues requiring separate adjudication—both of liability and damages—predominated over common questions. (*Id.* at p. 351.) In that case, the court observed, "The question of liability to individual class members would depend upon the particular conduct in which the suspect was engaged and the facts apparent to the handler before the police dog was employed." (*Id.* at p. 352.)

---

[11] Drivers routinely report to Diva when they have completed a particular assignment, and it appears possible to calculate the amount of on-call time drivers have experienced from existing trip and pay records. To the extent such data are not readily accessible, that absence is attributable to the inadequacy of Diva's own records and cannot be relied upon to resist the attempt of its employees to address inequities in Diva's compensation system. (See *Aguiar v. Cintas Corp. No. 2, supra,* 144 Cal.App.4th at p. 134; *Harper v. 24 Hour Fitness, Inc.* (2008) 167 Cal.App.4th 966, 976, fn. 5 [84 Cal.Rptr.3d 532].)

■ *Prince*, like the case at bar, was a wage and hour class action brought on behalf of the defendant's drivers who were paid only for the time they were on driving assignments, not for the time spent waiting between assignments. (*Prince v. CLS Transportation, Inc., supra*, 118 Cal.App.4th at p. 1323.) Division One of this court, reversing the trial court's order sustaining the defendant's demurrer to the class allegations in the complaint as premature, observed, "the trial court's finding that individual issues predominate is simply wrong." (*Id.* at p. 1329.) As the court explained, Prince, the plaintiff, had alleged "institutional practices by CLS that affected all of the members of the potential class in the same manner, and it appears from the complaint that all liability issues can be determined on a class-wide basis. At this stage, no more is required." (*Ibid.*; see also *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 933 [179 Cal.Rptr. 287] ["The one decisive issue pervading the litigation, whether the class members have been wrongfully deprived of pension benefits by an improper method of computation, will not be decided on the basis of facts peculiar to each class member, but rather, on the basis of a single set of facts applicable to all members. Thus, [the] action involves only one claim which turns on only one question of law common to all class members. Consolidation in a class action thereby creates substantial benefits for both the parties and the courts in that class action disposition averts the unnecessary risk of numerous and repetitive administrative and judicial proceedings with the attendant possibility of inconsistent adjudication."].)

c. *Superiority*

■ "A class action also must be the superior means of resolving the litigation, for both the parties and the court. [Citation.] 'Generally, a class suit is appropriate "when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer." [Citations.]' [Citation.] '[R]elevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing.' [Citation.] '[B]ecause group action also has the potential to create injustice, trial courts are required to " 'carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts.' " ' " (*Newell v. State Farm General Ins. Co.* (2004) 118 Cal.App.4th 1094, 1101 [13 Cal.Rptr.3d 343]; accord, *Aguiar v. Cintas Corp. No. 2, supra*, 144 Cal.App.4th at pp. 132–133; see Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2008) ¶ 14:16, p. 14-13 (rev. # 1, 2008) [benefits of class action evaluated by (1) interest of each putative class

member in controlling his or her case personally; (2) potential difficulties in managing a class action; (3) nature and extent of already pending litigation by individual class members involving the same controversy; and (4) desirability of consolidating all claims in a single action before one court].)

 Based on the same incorrect analysis it employed as to the other factors governing class certification, the trial court concluded Ghazaryan's claims were not suitable for class resolution. But it is no accident that "wage and hour disputes (and others in the same general class) routinely proceed as class actions." (*Prince v. CLS Transportation, Inc., supra,* 118 Cal.App.4th at p. 1328.) As the Supreme Court has observed, "California's overtime laws are remedial and are to be construed so as to promote employee protection. [Citation.] And, as we have recognized, 'this state has a public policy which encourages the use of the class action device.' [Citation.] ' "By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation." ' " (*Sav-On Drug Stores, supra,* 34 Cal.4th at p. 340; see also *Madera Police Officers Assn. v. City of Madera, supra,* 36 Cal.3d 403 [class action proper for police officers seeking payment of overtime wages, an accounting and declaratory relief]; *Morillion v. Royal Packing Co., supra,* 22 Cal.4th at p. 579 [class action proper for past and present agricultural employees claiming they were entitled to compensation for time spent going to and from employer's fields]; *Bell v. Farmers Ins. Exchange, supra,* 87 Cal.App.4th 805 [class action proper to recover for alleged nonpayment of overtime compensation].)

There is no question class treatment constitutes the superior mode of resolving Ghazaryan's claims in this action. Based on the evidence submitted by Diva in opposition to the motion, its compensation policy has been carefully drafted; and Diva very well may find its policy upheld as reasonable under the existing DLSE standard. We see no advantage to either party to resolution of this question on a piecemeal basis and agree with Ghazaryan such a prospect would jeopardize the ability of employees to find competent representation if restricted to their own individual claims. (See *Harper v. 24 Hour Fitness, Inc., supra,* 167 Cal.App.4th at p. 976.) In light of this conclusion, we need not accept Ghazaryan's invitation to decide whether a trial court has a duty to modify the class definition put forth by counsel for the putative class.

## DISPOSITION

The order of the superior court is reversed. The cause is remanded with directions to certify the subclasses as defined in Ghazaryan's motion. Ghazaryan is to recover his costs on appeal.

Zelon, J., and Jackson, J., concurred.

A petition for a rehearing was denied February 2, 2009, and respondent's petition for review by the Supreme Court was denied April 1, 2009, S170747.