[No. B229445. Second Dist., Div. Six. Oct. 19, 2011.]

FRANK MARLER et al., Plaintiffs and Appellants, v.
E.M. JOHANSING, LLC, et al., Defendants and Respondents.

## Counsel

Jones, Bell, Abbott, Fleming & Fitzgerald, Trenton J. Hill, Craig R. Bockman and William M. Turner for Plaintiffs and Appellants.

Joel Mark and Danielle R. Everson for Defendants and Respondents.

## Opinion

**GILBERT, P. J.**—Courts deciding whether to certify that a lawsuit qualifies for a class action must determine which obstacles create insuperable barriers to class relief and which do not. This can be a daunting task, but not here.

Plaintiffs Frank Marler, Sandra Marler and the Hollywood Beach Acquisition Association, Inc. (HBAA) (plaintiffs), filed a class action complaint on behalf of the Hollywood Beach Mobile Home Park (Park) residents against the Park

owners. They appeal an order denying their motion to certify a class action for breach of contract and fraud against defendants E.M. Johansing, LLC, J.D. McGrath Farms, Philip H. McGrath, Maureen McGrath Aggeler, Terence McGrath Aggeler, Sheila Aggeler Barnes and Anne Aggeler Will (defendants).

Plaintiffs allege that the Park is a senior citizens mobilehome park subject to rent control; that Park owners induced them to convert the Park to a condominium development through false promises about the purchase price they would pay for their lots; after Park residents approved the conversion, Park owners raised the lot prices so high that the majority of Park residents could not afford them.

■ We conclude, among other things, that (1) there is an ascertainable class of Park residents, (2) the trial court should have allowed plaintiffs leave to amend their class descriptions to more concisely identify class and subclass members, (3) the court erred in its analysis of the community of interest element of class certification, (4) defendants have not shown that plaintiffs lack standing to represent the class, and (5) an HBAA non-class-action representative suit would not be an adequate substitute for class action relief. We reverse and remand.

## ALLEGATIONS OF FACT

The facts in our opening summary are derived from the motion for class certification and documents that are not in dispute. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 478 [174 Cal.Rptr. 515, 629 P.2d 23] [reviewing courts may look to plaintiffs' declarations].) The trial court prepared a six-page order, but it did not contain a statement of facts.

In 2003, the Park was a "seniors" park with 96 mobilehomes. The average age of the Park residents was 70. Forty percent have low to moderate income, and many rely on government assistance.

Frank Marler and his wife purchased a mobilehome in the Park in 1999.

In 2003, the Park owners "began soliciting" Marler and other Park residents to convert the Park from a mobilehome "rental park" to a "resident-owned" mobilehome condominium development. Marler was concerned about the consequences. As a rental park, it was subject to local government rent control.

Marler and other Park residents felt the conversion "might displace [them] from [their] homes and undermine the security . . . that existed in the

rent-controlled park." The Park owners assured them the conversion "would put [them] in control." The Park residents would "become owners of the individual lots on which [their] mobilehomes rest," and a "residents' association" would become the new management.

On September 11, 2003, Frances Keesler, the Park's manager, wrote to all Park residents requesting them to complete a survey concerning the Park conversion to "resident ownership." She said, "At the Homeowners' Association meeting in May, Mr. Aggeler (one of the Park owners) advised that the lot prices would be $110,000 to $125,000 per lot."

The Park residents formed the HBAA "to represent the residents of the [Park]" with the conversion and facilitate "their individual purchases of their individual lots once the Conversion was approved."

The HBAA retained Attorney Sue Loftin to assist it with the conversion. In 2005, Loftin prepared a memorandum of agreement (MOA) and a subsequent cooperation agreement (COA), which the Park owners and the HBAA officers signed.

The MOA provided that the parties had agreed "to subdivide the [Park] and to sell individual condominium unit interests of the [Park] to the resident occupants . . . ." It specified, "The price per Lot shall be determined by averaging the price determined pursuant to two (2) appraisals done on the Property by MT Associates, Inc. on April 25, 2003 with a Lot Price range of $110,000 to $125,000 and on August 18, 2004 with a Lot Price range of $120,000 to $150,000."

In an application to the state's Mobilehome Park Resident Ownership Program (MPROP) for financial assistance to the Park residents, Loftin said the lot price will be "the average between the 2003 and the 2004 appraised lot price, and that *price will remain fixed until the subdivision is completed.*" (Italics added.)

The COA required the Park owners to "offer for sale Lots in fee simple to all Residents" so that the Park could be converted to a "manufactured housing condominium project." The COA included a list of "estimated lot prices" showing that all the lots in the Park fell within a price range of $109,915 to $142,044. The list had five categories of lots based on size, and each lot in each category had a specific purchase price, e.g., category (1) $109,915; category (2) $142,044; category (3) $129,970.26; category (4) $135,110.90; and category (5) $124,085.58. The COA also provided that Loftin would represent the Park owners and the HBAA, and the Park owners would pay her fees.

P.J. Szewzuk, the 2005 HBAA president, said the Park owners promised that "if [the Park residents] supported [the Park owners'] application for the Conversion," and if it was approved, they could purchase their lots "within an established price range—from $110,000 to $150,000." The factor motivating the Park residents to agree to a conversion was that lot prices were fixed "within the agreed price range."

The COA required the conversion to be approved by a majority of the HBAA members. All HBAA members were Park residents. Loftin prepared survey forms for the Park residents to sign with financial information for the purchase of their lots. The forms reflect that all the lots in the Park fell within a $110,000 to $143,000 price range. The Marlers' form listed the estimated purchase price for their lot as $126,500, loan closing costs of $3,500, a $250 park acquisition fee, and a $691 monthly payment.

Park residents from 82 of the 96 Park spaces elected to support the conversion. They also wrote letters and appeared before the city council to urge its approval.

In 2007, the Park owners informed the HBAA that, based on a new appraisal, the lot price range would be $198,875 to $240,800. Because of this increase, many Park residents now were unable to purchase their lots. The Marlers' lot price increased from $126,500 to $215,000, a price they could not afford. They were notified that if they did not purchase their lot at the increased price by December 29, 2009, it would be sold to a third party. The Marlers feared they would be evicted and their mobilehome would become "worthless" if they lacked the funds to move it.

Marler and Szewzuk later discovered that while the Park residents were relying on a fixed lot price range, Loftin was "secretly advising" the Park owners that they could raise it. Szewzuk said, "The HBAA . . . did not know . . . that [the Park owners] intentionally misrepresented the price range . . . ; nor could we have known that Attorney Loftin, was secretly advising [them] to undermine and defraud us."

The COA listed lot prices by categories, but Loftin added a clause making these prices subject to a "final allocation price" when the City of Oxnard approved the conversion. This provision was not in the MOA she prepared.

### Contentions

Plaintiffs contend (1) Loftin knew the Park owners would control the appraisal for the final allocation price, (2) she advised them they could achieve higher lot prices by using a different appraisal method, and (3) the

Park owners changed the method to increase the prices when it was too late for the Park residents to contest the conversion. They rely on an e-mail from Terry Aggeler, a Park owner, to Loftin, where Aggeler said, "[T]he first appraisals were based upon the park purchasing it. The last appraisal was based upon them buying the individual lots and they were appraised according to size, etc. *You told me all along that the prices would be higher once they were appraised this way and you were right.*" (Italics added.) He added, "Sue, *you told me that they could not block the conversion several months ago.*" (Italics added.) MT Associates, Inc., prepared the 2007 appraisal. In a cover letter, it said Aggeler selected the appraisal method.

Defendants contend their actions were appropriate. But we are not deciding the facts or the merits of the underlying case. (*Cohen v. DIRECTV, Inc.* (2009) 178 Cal.App.4th 966, 974 [101 Cal.Rptr.3d 37].) "The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' " (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194].) Our focus is on the correctness of the class certification ruling. We will be "touching aspects of the merits" only to determine whether the case plaintiffs claim they will prove at trial is a candidate for class relief. (*Wal-Mart Stores, Inc. v. Dukes* (2011) 564 U.S. ___, ___ [180 L.Ed.2d 374, 131 S.Ct. 2541, 2552].) "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." (*Id.* at p. ___ [131 S.Ct. at p. 2551].)

*Trial Court Proceedings*

In their second amended complaint, plaintiffs allege causes of action for specific performance, breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing. They claim that the class "consists of more than 70 persons" and is consequently "so numerous that . . . joinder of all of the Class members is impracticable."

In the motion for class certification, plaintiffs allege there were "two classes of Park residents"—a contract class and a fraud class. Both classes share the common claim that the Park owners breached a promise to sell lots within a fixed price range. Plaintiffs assert that the lot values "are now at roughly the same prices as they were in 2003–2004," but the higher prices the Park owners demanded were motivated by "their desire to be paid more for the Park."

The trial court denied the motion. It ruled, among other things, that the class was not ascertainable and that there was no community of interest.

## DISCUSSION

### Class Action Requirements

The Marlers contend that they made a sufficient showing of an ascertainable class of Park residents. They claim the trial court erred by denying their motion and at least should have allowed them to amend their class definition to more concisely define the class members. We agree.

■ "Class actions are statutorily authorized 'when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .' (Code Civ. Proc., § 382.)" (*Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1530 [87 Cal.Rptr.3d 518].) "In order to maintain a class action, certain prerequisites must be met, specifically, 'the existence of an ascertainable class and a well-defined community of interest among the class members. [Citation.] The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' " (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 808 [50 Cal.Rptr.2d 736].)

Defendants note that appellate courts give deference to trial court findings of fact. True, but here, where the trial court's ruling is based on " 'improper criteria or incorrect legal assumptions' " in deciding class certification, our review is "de novo." (*Cho v. Seagate Technology Holdings, Inc.* (2009) 177 Cal.App.4th 734, 745 [99 Cal.Rptr.3d 436].) " '[I]f the trial court failed to follow the correct legal analysis . . . , "an appellate court is required to reverse . . . 'even though there may be substantial evidence to support the court's order.' " ' " (*Ghazaryan v. Diva Limousine, Ltd., supra,* 169 Cal.App.4th at p. 1530.)

### An Ascertainable Class

■ In determining whether there is an ascertainable class, we look to the class definition. It must be "precise" and "objective." (*Cho v. Seagate Technology Holdings, Inc., supra,* 177 Cal.App.4th at p. 746.) "A class definition that is ambiguous presents a problem of class ascertainability that ' "goes to the heart of the question of class certification . . . ." ' " (*Ibid.*) "In the absence of an ascertainable class, ' "it is not possible to give adequate notice to class members or to determine after the litigation has concluded who is barred from relitigating." ' " (*Ibid.*) "The goal in defining the class is to use terminology that will convey sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiff wishes to represent." (*Ibid.*)

Some courts conclude that class ascertainability is tested by simply determining if class members may be identified from the most inclusive facial class definition. (*Cohen v. DIRECTV, Inc., supra,* 178 Cal.App.4th at p. 976.) Under this method, courts are not concerned whether the definition is overbroad, and they do not consider community of interest factors in testing ascertainability. But our Supreme Court stated, "[W]hether there is an *ascertainable class depends* in turn *upon the community of interest* among the class members in the questions of law and fact involved." (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 706 [63 Cal.Rptr. 724, 433 P.2d 732], italics added.)

Relying on *Daar,* we and other courts have taken a more nuanced approach. We do not exclude an analysis of community of interest factors in testing ascertainability. We may consider whether the class "definition is overbroad," and if the plaintiffs have shown that "class members who have claims can be identified from those who should not be included in the class." (*Ghazaryan v. Diva Limousine, Ltd., supra,* 169 Cal.App.4th at p. 1533, fn. 8; see *Akkerman v. Mecta Corp., Inc.* (2007) 152 Cal.App.4th 1094, 1100–1101 [62 Cal.Rptr.3d 39]; see also *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809 [94 Cal.Rptr. 796, 484 P.2d 964].)

Here, however, using either approach, the result is the same. There is an ascertainable class of Park residents. Plaintiffs propose two classes, a contract class and a fraud class.

Plaintiffs define the contract class as: "*Residents of the Park,* all of whom are entitled to Defendants' performance of the commitment in the Memorandum of Agreement and Cooperation Agreement to offer to sell to the residents the lots on which the residents' mobilehomes rest at prices within the range agreed in the Memorandum of Agreement and Cooperation Agreement . . . ." (Italics added.)

Plaintiffs define the fraud class as: "*Residents of the Park* who were induced by Defendants' representations to the HBAA and to them as members of the HBAA to support Defendants' application and efforts for conversion of the Park from a rental park to a resident-owned and operated park, but who were not permitted by Defendants to purchase their lots within the promised price range of $110,000 to $150,000 once the lots became saleable." (Italics added.)

Here there are "objective characteristics and common transactional facts making the ultimate identification of class members possible." (*Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915 [107 Cal.Rptr.2d 761].) The class members in the fraud and contract classes are

Park residents, an identifiable group. They can identify themselves as class members, and they can be identified from the Park owners' business records, park leases, and HBAA records. Both classes stem from the same lot price offers. Class members can determine if they fit within the fraud class because they know if they were induced to support the conversion because of the offers.

In denying class certification, the trial court said that the proposed class definition was "vague as to time." It said, "Residents of the Park as of what time—when one or both the referenced agreements were made, when the Cooperation Agreement was ratified, when conversion was approved, when the action was filed, or when judgment is entered?"

The class descriptions could be improved by including time periods to eliminate any confusion. But because "Residents of the Park" is an objectively identifiable group tied to 96 Park spaces, denying class certification on ascertainability grounds is not appropriate. (*Hicks v. Kaufman & Broad Home Corp., supra*, 89 Cal.App.4th at p. 915.)

■ Defendants claim the class "definition . . . was overbroad as to whether the Contract Class included people who were residents of the Park, who were members of HBAA, or both." But HBAA membership is not a requirement for membership in the contract class. The COA broadly defines "residents" as people "whose Homes are situated" in the Park and "reside" there. Moreover, possible overbreadth is not fatal. "[C]lass certification should not be denied on overbreadth grounds when the class definition is only slightly overinclusive." (*Ghazaryan v. Diva Limousine, Ltd., supra*, 169 Cal.App.4th at p. 1533, fn. 8.) In such cases, this is "not a bar to class certification," as those improperly included may be placed in a subclass or dismissed from the case. (*Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 135 [50 Cal.Rptr.3d 135].)

Overbreadth may be cured by modifying the class definitions, adding a more precise description of the "Residents of the Park" or using subclasses. Park and HBAA records identify the Park residents and the HBAA member-residents. Moreover, this class is small and more easily defined than other larger and more complex classes that courts have found to be "plainly" ascertainable. (See, e.g., *Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605, 617 [236 Cal.Rptr. 605] ["all persons nationwide subscribing to Sprint since January 1, 1981, who were charged for one or more unanswered long distance calls. Plainly such class is ascertainable."].)

The trial court reasoned, "Limiting the class to residents who are 'entitled to Defendants' performance of the commitment' to sell within a given price

range embeds within the class definition one of [the] central issues in the case . . . ." It found that it was inappropriate "to define the class in terms of the ultimate issue . . . ."

 But the inclusion of an ultimate issue in the class definition does not defeat ascertainability. "A class is still ascertainable even if the definition pleads ultimate facts or conclusions of law." (*Hicks v. Kaufman & Broad Home Corp., supra*, 89 Cal.App.4th 908, 915.) In *Hicks*, the appellate court cited an earlier case where "the class was defined as persons who owned policies issued by defendant ' "which were purchased as a result of deceptive or fraudulent sales practices . . . ." ' " (*Ibid.*)

Plaintiffs contend the trial court erred by simply denying their motion. They claim it should have allowed them to amend the class definitions. We agree.

 Because there is an identifiable class, plaintiffs' rights should not be forfeited because of counsel's choice of words in the complaint or class certification motion. Drafting class descriptions is not an easy task. Amendments are permitted so that class cases may proceed on their merits. (*Cho v. Seagate Technology Holdings, Inc., supra*, 177 Cal.App.4th at pp. 747–748.) "[T]his state has a public policy which encourages the use of the class action device . . . ." (*Richmond v. Dart Industries, Inc., supra*, 29 Cal.3d at p. 473.) " '[I]f necessary to preserve the case as a class action, the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable.' " (*Cho*, at pp. 747–748.) "As it is the court's duty to certify an identifiable and ascertainable class, the court is not limited . . . to the class description contained in plaintiff's complaint." (*Id.* at p. 748.) Plaintiffs should be given the opportunity on remand to amend the class descriptions.

### Community of Interest for the Contract Class

Defendants claim this case cannot proceed as a contract class action because the class members' individual issues predominate.

The trial court noted, however, that there were a number of common class issues. These included the offers to sell lots, the range of prices, and the facts about the alleged breach. Consequently, a major portion of the class contract claim is subject to common, as opposed to individual, proof. The court, however, said, "[E]ven if plaintiffs prevail on the contract claims, individual trials on damages or specification of sub-classes may be necessary."

 But this prospect does not require denial of class certification. " '[T]hat each class member might be required ultimately to justify an

individual claim does not necessarily preclude maintenance of a class action.' [Citation.] Predominance is a comparative concept, and 'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate.' " (*Sav-On Drug Stores, Inc. v. Superior Court, supra*, 34 Cal.4th at p. 334.)

The focus is on management. "Individual issues do not render class certification inappropriate so long as such issues may effectively be managed." (*Sav-On Drug Stores, Inc. v. Superior Court, supra*, 34 Cal.4th at p. 334.) "Nor is it a bar to certification that individual class members may ultimately need to itemize their damages." (*Ibid.*)

Plaintiffs contend the relief and damage issues are manageable because the contract class judgment would involve lots within a set price range of $110,000 to $150,000. For class members seeking enforcement of the agreement, there would be no need to prove individual damages. For those seeking monetary relief, plaintiffs claim (1) the MOA and COA identify the lots and prices, (2) all class members fall within the COA's five categories of lots, (3) all class members received price offers within the $110,000 to $150,000 price range, and (4) damages will be "established by an allocation appraisal that will cover each of the lots." They argue that consequently "there are no issues of damage that must be litigated" by each class member. They have shown that this issue is manageable with minimal individual testimony and more reliance on documents, appraisals and expert testimony. (*Vasquez v. Superior Court, supra*, 4 Cal.3d at p. 809, fn. 5.) Management here should present no problem because the class is small. On remand, the parties may present additional evidence to assist the court in deciding the most efficient procedure for proving the damage claims in a class format.

### Community of Interest for the Fraud Class

Defendants contend there is no community of interest among the fraud class. They claim it is not "subject to common proof."

But the trial court noted there were common class issues as to (1) the representations made to the class, (2) the people who made them, and (3) the truth or falsity of the representations. A substantial portion of the fraud claim was subject to common proof. The court concluded, however, that the reliance and damage issues would necessarily require individual proof from each class member, making class relief inappropriate.

Plaintiffs contend the trial court erroneously assumed the reliance issue required testimony by each class member. They claim such individual testimony is not necessarily required. We agree.

 "The rule in this state . . . is that it is not necessary to show reliance upon false representations by direct evidence." (*Vasquez v. Superior Court, supra,* 4 Cal.3d at p. 814.) " 'The *fact of reliance* upon alleged false representations *may be inferred* from the circumstances attending the transaction which oftentimes afford much stronger and *more satisfactory evidence of the inducement* which prompted the party defrauded to enter into the contract than his direct testimony to the same effect.' " (*Ibid.,* italics added.)

These principles apply to fraud class actions. (*Vasquez v. Superior Court, supra,* 4 Cal.3d at p. 814.) "The requirement that reliance must be justified in order to support recovery may also be shown on a class basis." (*Id.* at p. 814, fn. 9.) "If the court finds that a reasonable [person] would have relied upon the alleged misrepresentations, an inference of justifiable reliance by each class member would arise." (*Ibid.*) " 'Moreover, a presumption, or at least an inference, of reliance arises whenever there is a showing that a misrepresentation was material.' " (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 327 [93 Cal.Rptr.3d 559, 207 P.3d 20].)

 Defendants suggest plaintiffs must prove the Park owners made the representations directly to each class member. But the trial court correctly noted that representations may be actionable if the Park owners made them to a third party, such as the HBAA. " 'The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, *is made to a third person and the maker intends or has reason to expect that its terms will be repeated* or its substance communicated to the other . . . .' " (*Geernaert v. Mitchell* (1995) 31 Cal.App.4th 601, 605–606 [37 Cal.Rptr.2d 483], italics added & omitted.)

Here plaintiffs present evidence that all class members directly received and relied on the Park owners' representations. Marler said they received offers to purchase lots "within an established price range—from $110,000 to $150,000." Plaintiffs detrimentally relied because the Park owners gave them prices they did not intend to use, and raised them after the conversion vote when it was too late to challenge the conversion.

 Plaintiffs suggest there is no need to call every class member as a witness, as Marler's and Szewzuk's testimony will prove the Park residents were victims of a "bait and switch"; and documents will prove there was a common representation to the class, such as Keesler's letter, which went to all Park residents and included a fixed lot price representation. "Written misrepresentation claims provide an adequate basis for a finding of common questions within the class." (*Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 478.)

All class members also received a survey "asking them to indicate whether they supported the Conversion so the results of the survey could be provided to the governmental entities" that approve conversions. The individual survey forms listed an "estimated purchase price," "estimated loan closing costs," and "estimated maximum monthly payments," all within a lot price range of $110,000 to $150,000. Each form contained a request that each Park resident check a box to indicate whether he or she agreed with the "conversion of the park," "[b]ased on those figures," and a request to have *all adult members . . .* sign and date" it. The forms alone are proof that Park residents from 82 of the 96 Park spaces supported the conversion. There is merit to plaintiffs' claim that Marler's and Szewzuk's testimony, coupled with Keesler's letter, the MOA, the COA, and the survey forms, may show evidence of class reliance without the need for testimony from many class members.

Plaintiffs suggest that proving damages "will not require individual mini-trials" because "[t]he primary relief the Fraud Class seeks is specific performance." They are correct if the relief is so limited. But the trial court said it was not so limited because their prayer for relief seeks actual damages "in an amount according to proof." It ruled this was "vague as to the nature of the damages which will be pursued on behalf of the Fraud Class."

▮ Tort damages must be carefully defined so they will not " ' "vary widely from claim to claim, creating a wide disparity" ' " in the relief for the class members. (*Akkerman v. Mecta Corp., Inc., supra*, 152 Cal.App.4th at p. 1102.) An overbroad or vague claim for class damages may cause the case to " ' " 'splinter into individual trials' " ' " and become unmanageable. (*Ibid.*) Plaintiffs must carefully define the damages so they are closely connected to the common class liability claims. The trial court correctly found that plaintiffs had not sufficiently defined the scope of damages. But plaintiffs will have an opportunity to more carefully do so on remand where the court will determine the type of tort damage claims that may be decided in a class format.

*Standing*

Defendants claim a remand is unnecessary because, as a matter of law, the Marlers and "all the other residents of the Park" lack standing to pursue this case or represent a class. We disagree.

The trial court discussed standing, but it denied class certification on other grounds. The court said the Marlers did not have standing to represent the fraud class based "on *the current state* of the pleadings." (Italics added.) It correctly noted that the Marlers are plaintiffs in all of the causes of action

except fraud. Implicit in this court's remand is the recognition that an amendment to the complaint will remedy this. On remand, they will have an opportunity to do so.

Defendants contend that only the HBAA has standing under the COA "to enforce the Owners' obligations under it." They note (1) that they signed the COA with the HBAA, not the Park residents; (2) the COA contains "a no third party beneficiary" provision; and (3) this provision precludes Park residents from bringing any action against them.

The "no third party beneficiary" (NTPB) clause provides, "No person or entity who is not a Party hereto: (1) is intended to be a beneficiary under this Agreement; (2) shall be entitled to rely on any of the provisions in this Agreement; or (3) has, nor is to be, accorded any rights, benefits, or privileges under any provision in this Agreement."

Defendants suggest that as a matter of law the NTPB provision bars Park residents from pursuing a fraud class action against them. We disagree. This clause is a contractual provision. In the complaint, the HBAA alleges its members were induced "to enter into agreements" without knowing "that Defendants' representations were false." Contractual provisions are "voidable" where parties are fraudulently induced to agree to them. (*Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 921 [114 Cal.Rptr.3d 280, 237 P.3d 598].) Plaintiffs' declarations allege fraudulent inducement. The NTPB clause is not an exculpatory provision immunizing defendants from claims that they committed fraud. (*Ibid.*; *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 654–655 [191 Cal.Rptr. 209]; *Kett v. Graeser* (1966) 241 Cal.App.2d 571, 574 [50 Cal.Rptr. 727].) The provision does not bar the Marlers from pursuing a fraud class action.

For the contract class, defendants treat the Park residents as strangers to the COA with no enforceable rights. But their analysis omits the COA's purpose—to allow the residents to purchase their lots. It provides that "the Owners shall offer for sale Lots in fee simple *to all Residents* . . . ." (Italics added.) This was necessary to have a conversion. Moreover, the COA was "*only effective* upon the review and ratification *of a majority of the members* of the [HBAA]." (Italics added.) Those members are Park residents.

A "no third party beneficiary" clause may bar claims by strangers who only incidentally benefit from a contract. But it will not bar the claims of

the Park residents who are the primary COA beneficiaries and the ones whose vote determined the agreement's enforceability. (*Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1227, 1234–1235 [18 Cal.Rptr.3d 178].) Defendants' position would undermine the COA's purpose by leaving the beneficiaries without a remedy. Defendants also narrowly interpret the word "party." They claim the HBAA is a party and Park residents are not. But the distinction is largely illusory considering who approved the COA. All those who signed the COA on behalf of the HBAA were Park residents. The HBAA was not buying lots; it was assisting the Park residents to do so. Defendants also treat this clause as a litigation waiver. But the Marlers did not waive their right to sue. "[T]he right to pursue claims in a judicial forum is a substantial right and one not lightly to be deemed waived." (*Marsch v. Williams* (1994) 23 Cal.App.4th 250, 254 [28 Cal.Rptr.2d 398].) The clause does not bar litigation by these beneficiaries.

"Standing is a question of law that we review de novo." (*IBM Personal Pension Plan v. City and County of San Francisco* (2005) 131 Cal.App.4th 1291, 1299 [32 Cal.Rptr.3d 656].) The Marlers claim they have standing to represent the contract class because as "beneficiaries [of] the MOA and the COA, they have a substantial interest in Defendants' performance of [those agreements]." Their declarations show their claims are typical of the class of Park tenants who believed the "promised price range of $110,000 to $150,000" to be "enforceable components of the MOA and [COA]."

Defendants claim the trial court previously determined that only the HBAA could pursue a fraud claim because the Park owners' representations were directed to it, not the Park residents. But in its class certification ruling, the court essentially recognized the error of its prior determination by its citation to *Geernaert v. Mitchell, supra,* 31 Cal.App.4th at page 601. Moreover, plaintiffs presented evidence showing that representations were made directly to the Park residents. The fraud and contract classes share the underlying claim about the lot price representations. The Marlers made a sufficient showing that they "will fairly and adequately protect" the interests of both classes. (*La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 871 [97 Cal.Rptr. 849, 489 P.2d 1113].)

██ Where class relief is proper, plaintiffs should be allowed to find a class representative. "If . . . the court concludes that the named plaintiffs can no longer suitably represent the class, it should at least afford plaintiffs the opportunity to amend their complaint, to redefine the class, or to add new individual plaintiffs, or both, in order to establish a suitable representative."

(*La Sala v. American Sav. & Loan Assn., supra,* 5 Cal.3d at p. 872.) Defendants have not shown why the Marlers and other Park residents should not be class representatives for the fraud and contract classes.

### Superiority of Class Action Relief

Plaintiffs claim the trial court denied class certification because it believed that having the HBAA pursue an action "in its representative capacity on behalf of its members" in a non-class-action format was superior to a class action.

But it is unclear from this record whether the trial court reached such a conclusion. Plaintiffs base their claim on the court's citation to *Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1352–1353 [98 Cal.Rptr.3d 568]. There, however, the court merely held that a factor in deciding class certification is whether "the moving party proves a class action is 'superior' to separate lawsuits by class members." (*Ibid.*)

Defendants claim "class action treatment was not in any way superior." But if class relief is proper, a non-class-action representative suit is an ineffective substitute. In a class action, class members are entitled to notice and have the right to "opt out" of the case. (*Salton City etc. Owners Assn. v. M. Penn Phillips Co.* (1977) 75 Cal.App.3d 184, 189 [141 Cal.Rptr. 895].) If they remain, they are bound. This provides certainty for the court and the parties.

By contrast, in a non-class-action representative case, a plaintiff ordinarily cannot obtain individual monetary relief for parties not joined in the action. Members of the plaintiff's group who are not named are not necessarily bound. They could file individual lawsuits creating a multiplicity of actions. (*Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162, 1176 [135 Cal.Rptr.2d 834].) This could lead to conflicting results and repetitive litigation. For efficiency and reliability, the class action is superior.

Plaintiffs note that a substantial number of Park residents lack the financial ability to file independent litigation. This is a factor favoring class relief. Without it, they would forfeit their legal rights. Having the HBAA as a class representative is superior to the non-class-action alternative.

We have reviewed the parties' remaining contentions and they do not change the result we have reached.

The order denying class certification is reversed. The matter is remanded to the trial court for further proceedings in accordance with the principles discussed in this opinion. Costs on appeal are awarded in favor of plaintiffs.

Yegan, J., and Perren, J., concurred.