Filed 11/12/13 Certified for publication 12/4/13 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROBERTO MARTINEZ et al., | B242807 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC377269) |
| v. | |
| JOE'S CRAB SHACK HOLDINGS et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Charles F. Palmer, Judge. Reversed and remanded.

Righetti Glugoski, Matthew Righetti and John Glugoski, for Plaintiffs and Appellants, Roberto Martinez, Lisa Saldana, Chanel Rankin-Stephens and Craig Eriksen.

Epstein Becker & Green, Michael S. Kun and Ted A. Gehring, for Defendants and Respondents Crab Addison, Inc. and Ignite Restaurant Group, Inc.

Law Offices of Mary E. Lynch and Mary E. Lynch; Sheppard, Mullin, Richter & Hampton and Charles F. Barker, for Defendant and Respondent Landry's Restaurants, Inc.

_____

Litigation by class action has long been recognized as a superior method of resolving wage and hour claims in California (see *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1033 (*Brinker*)), including those seeking redress for unpaid overtime wages. Nonetheless, when confronted with the myriad individual facts asserted by employers in support of the executive exemption as a defense to a wage claim, courts at all levels have struggled to answer the question central to certification of a class—that is, "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav-on Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327 (*Sav-on*); accord, *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1531.)[1] Here, the trial court, after wrestling with the factual issues raised by Defendants Crab Addison, Inc., Ignite Restaurant Group, Inc. and Landry's Restaurants, Inc.,[2] denied class certification to a putative class consisting of managerial employees allegedly misclassified as exempt on the grounds plaintiffs had failed to establish (a) their claims are typical of the class, (b) they can adequately represent the class, or (c) common questions predominate the class claims such that a class action is the superior means of resolving the litigation. (See *Brinker,* at p. 1021; Code Civ. Proc. § 382.) We reverse and remand for reconsideration

---

[1] "The Legislature has commanded that '[a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek . . . shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee.' (Lab. Code, § 510, subd. (a).) The Industrial Welfare Commission (IWC), however, is statutorily authorized to 'establish exemptions from the requirement that an overtime rate of compensation be paid . . . for executive, administrative, and professional employees, provided [inter alia] that the employee is primarily engaged in duties that meet the test of the exemption, [and] customarily and regularly exercises discretion and independent judgment in performing those duties . . . .' (*Id.,* § 515, subd. (a).)" (*Sav-on, supra,* 34 Cal.4th at p. 324.)

[2] Until November 2006 Joe's Crab Shack, a nationwide restaurant chain, was owned by Landry's Restaurants, Inc. (Landry's). The chain is now owned by Crab Addison, Inc., a subsidiary of Ignite Restaurant Group, Inc. (collectively CAI). CAI was sued erroneously under its former name, Joe's Crab Shack Holdings.

in light of our recent decision in *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701 (*Benton*) and our discussion below.

## FACTUAL AND PROCEDURAL BACKGROUND

Roberto Martinez, Lisa Saldana, Craig Eriksen and Chanel Rankin-Stephens are current or former employees of different Joe's Crab Shack (JCS) restaurants in California. Martinez filed the original complaint in September 2007, seeking to represent a class of salaried managerial employees who worked at JCS restaurants in California on claims they had been misclassified as exempt employees and were entitled to overtime pay.[3] In March 2010 the trial court denied Martinez's motion for class certification on the ground he was not an adequate class representative. Martinez did not appeal that order.

The trial court permitted Saldana, Eriksen and Rankin-Stephens to join the lawsuit as named plaintiffs. In June 2011 plaintiffs moved for certification of a class consisting of "[a]ll persons employed by Defendants in California as a salaried restaurant employee in a Joe's Crab Shack restaurant at any time since September 7, 2003." In support of their motion plaintiffs presented training and operations manuals, as well as deposition testimony from various witnesses employed by CAI and Landry's. According to this evidence, JCS's hiring and training practices are uniform throughout the chain; it utilizes an operations manual that applies to all restaurants and every employee; each restaurant offers the same menu; and managerial employees are evaluated using the same form and procedure. All managerial employees are classified as exempt employees and are expected to work a minimum of 50 hours per week.[4] Each restaurant is staffed with three

---

[3]     The complaint also alleged meal period, rest period and wage statement claims, none of which is an issue in this appeal.

[4]     Both CAI and Landry's categorized managerial employees as exempt under Wage Order 5, promulgated by the IWC. IWC orders "regulate wages, work hours, and working conditions with respect to various industries and occupations." (*Singh v. Superior Court* (2006) 140 Cal.App.4th 387, 393.) Wage Order 5 is codified at California Code of Regulations, title 8, section 11050 (see *Singh,* at pp. 393-394) and governs the "Public Housekeeping Industry," which includes restaurants. (Cal. Code Regs., tit. 8, § 11050, subds. 1 & 2(P)(1).) Wage Order 5 requires employers to provide

to seven managerial employees, who are cross-trained in positions throughout the restaurant and perform the same general tasks.[5]

Plaintiffs also filed 22 declarations from current and former salaried employees who held managerial positions during the relevant time period.[6] The gist of these declarations is the same. Most of the declarants were employed in assistant managerial positions. Although they were told they would be working 50 to 55 hours per week, all stated they had routinely worked more than 55 hours per week; and some reported working more than 70 hours per week. JCS did not keep track of the hours worked by

---

overtime pay (*id.,* subd. 3(A)) but exempts from this requirement "persons employed in . . . [¶] . . . executive . . . capacities." (*id.*, subd. 1(B).) """A person employed in an executive capacity means any employee: [¶] . . . [¶] (a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and [¶] (b) Who customarily and regularly directs the work of two or more other employees therein; and [¶] (c) Who has the authority to hire or fire other employees . . . ; and [¶] (d) Who customarily and regularly exercises discretion and independent judgment; and [¶] (e) Who is primarily engaged in duties which meet the test of the exemption." (*Id.,* subd. 1(B)(1).)

The parties agree the executive exemption exception applies only if employees spend more than half their working time engaged in exempt work.

[5] During the period the chain was owned by Landry's, each restaurant was staffed with a general manager, an assistant manager, a kitchen manager and a front-end manager. Soon after this lawsuit was filed, CAI eliminated the specific positions of kitchen manager and front-end manager and categorized them as assistant managers. CAI's designated person most knowledgeable about JCS managerial practices (see Code Civ. Proc., § 2025.230), Michael Young, testified that "all restaurants do universal tasks. . . . [Employees] wash dishes, they serve food, they help guests. It's all basically the same. However, each restaurant is different . . . ; depending on what's going on in the course of a day. How many people you have. Skill level of people." Asked to distinguish between tasks performed by hourly employees from the same tasks performed by managerial employees, Young stated, "Managers . . . help out in various positions. They may perform the same tasks, but it doesn't make it an hourly function at that time. If they're performing their job based on where they need to be at a specific time[;] they're using their judgment to assess where they need to be and what they're doing at that specific time."

[6] As of the date the motion was filed, the parties agreed there were 182 members of the putative class.

managerial employees. Because labor budgets were set by district or regional managers and, in general, did not provide adequate staffing, managerial employees were required to perform "utility" functions, filling in where needed as cooks, servers, bussers, hosts, stockers, bartenders or kitchen staff. Managerial employees were also required to fill in when hourly employees failed to show up and conduct inventory one night a week after the restaurant closed, which could take as long as three to four hours to complete. As a result, the declarants stated they had worked extended time in positions ordinarily occupied by hourly employees but had received no overtime compensation for those tasks. Each of the declarants estimated he or she had spent the majority of their time performing hourly tasks; estimates ranged from more than 50 percent to 95 percent. Several employees, some of whom had worked in more than one restaurant or under both Landry's and CAI ownership, stated that these practices were common across the board.[7]

CAI and Landry submitted declarations from approximately 27 putative class members, each of whom reported significant variance among the duties associated with specific management positions, the amount of time they routinely spent on particular tasks and the total amount of time worked each week. More than half of the declarations

---

[7]     For instance, a former JCS employee (Brian Brinson), who first worked as an hourly kitchen worker in a Virginia JCS location, moved to California and worked in three different JCS locations as an hourly kitchen supervisor and as a salaried kitchen manager and senior kitchen manager. As a salaried manager Brinson averaged 60 to 70 hours per week, including weekly inventory that continued into the early hours of the morning. He estimated he spent 80-90 percent of his time performing the same tasks as the hourly employees—seating, bartending, running food, bussing tables, serving food, cleaning and cooking. His managerial duties took little time to complete. Based on his experience in both capacities he stated: "I can honestly say that when I moved into a managerial position my tasks remained the same and I did the same things I did when I was an hourly employee . . . . I felt like I was every position rolled into one. At Joe's, things are done this way and I often needed to fill in wherever I was needed. In addition, often we would have to cut back on labor and send some of our hourly employees home[;] this meant even more time on hourly tasks. Further, if I needed to cover employee shifts I would often work a double shift." Brinson stated his job required him to act in a "utility" capacity and that, because managers did not count against the labor budget, managers were required to perform the tasks of hourly employees, who would have had to be paid overtime.

were provided by general managers, most of whom had served in subordinate managerial positions in the past.[8] Many of the declarants had been hired when Landry's owned the chain and had signed acknowledgements of the duties associated with their job and their exempt status.[9] These declarants uniformly described their duties as primarily managerial in nature and, with only a couple of exceptions, opted out of the putative class proposed by plaintiffs.[10] Many declarants estimated the amount of time they spent weekly performing discrete "primary" (that is, managerial) duties and "additional" (that is, nonexempt) duties and stated that, even when they were performing tasks ordinarily associated with hourly workers, they were monitoring the restaurant and supervising and directing employees.[11] James Kuhn, a senior vice president with CAI who oversees the

---

[8] Damian Garcia, a general manager, had also worked as an assistant general manager and a kitchen manager. He stated the total amount of time he spent on exempt activities varied depending on his position. As a general manager he spent five hours per week training employees but as a kitchen manager spent 10 to 15 hours each week training employees. He spent less time directing work as a kitchen manager and spent more time in that role as an assistant general manager. As a general manager he spent five hours per week analyzing and forecasting sales but had no such duty as a kitchen manager.

[9] In 2005 Landry's directed its general managers to meet with salaried employees to review their duties and execute acknowledgements the majority of the employees' time was spent on exempt tasks. There is no evidence in the record CAI ever trained or instructed managerial employees regarding the distinction between exempt and nonexempt duties.

[10] According to CAI, more than 90 putative class members have settled potential claims with CAI and Landry's directly although the record includes only 10 of these settlement agreements. CAI obtained these releases by reading a prepared script to managerial employees that inadequately explained the claims and offering a $500 payment for each year employed as a manager (or approximately $10 per week). Three other employees, including Kevin Austin, a former general manager who provided a declaration on behalf of CAI in this litigation in 2008, settled their claims through the Division of Labor Standards Enforcement. The settlement amounts that have not been redacted (eight of 13 agreements) range from $250 to $5,000.

[11] Primary duties included interviewing, hiring and training employees, scheduling, planning and making job assignments, directing employees, evaluating performance, determining what needed to be purchased for the restaurant, disciplining employees, analyzing and forecasting sales, inventory preparation and analysis, communicating about

6

13 California JCS restaurants, stated the activities of managerial employees differed based on the sales volume, seating capacity, amenities and staffing of the particular restaurant, no two of which are the same. While CAI centralized management makes policy decisions affecting JCS restaurants across the board, "the day-to-day decision-making and daily running of the restaurants is left to each restaurant's management team."

CAI and Landry's also submitted evidence impeaching the statements of the named plaintiffs. In deposition testimony the named plaintiffs each conceded he or she was unable to estimate the amount of time spent on exempt tasks as opposed to nonexempt tasks and that every day was different. Eriksen testified it would be "unrealistic" to guess how much time he spent on particular tasks and admitted there were weeks when he devoted more than 50 percent of his time to managerial tasks.[12] Former colleagues of Saldana and Martinez also contradicted statements each had made in declarations concerning hours worked and the time spent on hourly tasks.[13]

Presented with this evidence, the trial court denied the motion for class certification on the grounds plaintiffs had failed to establish (1) their claims were typical of the class, (2) they could adequately represent the class, (3) common questions

corporate matters and transitioning assistant managers and staff. Additional duties included interaction with guests, cooking, food service, bartending, bussing tables, expediting orders, taking inventory, checking and replenishing stock, routine clerical duties, hands-on maintenance and cleaning. Most declarants estimated approximately one-third of their time (varying between 55 and 70 hours per week) was spent on additional duties.

[12]     Eriksen is also one of the employees who executed a form provided to him by Landry's in 2005 attesting he spent 74.5 percent of his time in managerial functions. The trial court sustained an objection to contradictory statements contained in his declaration based on this inconsistency. Rankin-Stephens executed a similar form in 2006 acknowledging she spent 67.3 percent of her time on managerial functions.

[13]     Martinez's performance evaluations criticized him for failing to supervise or discipline staff or otherwise act in a managerial function. Saldana's evaluations praised her attitude but encouraged her to think more broadly about her job. There is evidence that Saldana was ultimately terminated for altering time reports.

predominated the claims, and (4) a class action is the superior means of resolving the litigation. The first two findings were based on plaintiffs' inability to estimate the number of hours spent on individual exempt and nonexempt tasks and their admission the amount of time spent on particular tasks varied from day to day. As to the third and fourth findings, the court acknowledged the existence of common questions of law and fact,[14] but concluded there remained significant individual disputed issues of fact relating to the amount of time spent by individual class members on particular tasks. The variability among individual members of the putative class would require adjudication of the affirmative defense of exemption for each class member, "a time- and resource-consuming process." The court rejected as unfair plaintiffs' proffered trial plan, under which their expert, Richard Drogin, proposed to assess the rate at which managerial employees are engaged in nonexempt tasks through statistical sampling methods. (See *In re Wells Fargo Home Mortgage Overtime Pay Litigation* (N.D.Cal. 2010) 268 F.R.D. 604, 612 ["Assume that the court permitted proof through random sampling of class members, and that the data, in fact, indicated that one out of every ten [class members] is exempt. How would the finder of fact separate the one exempt [class member] from the nine nonexempt [class members] without resorting to individual mini-trials."].)[15] Under these circumstances, the court concluded, a class action would not be the superior means of resolving the litigation.

## DISCUSSION

1. *The Standard of Review for a Ruling on Class Certification*

Class actions are statutorily authorized "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." (Code Civ. Proc., § 382.) The

---

[14]    The court found that all putative class members perform similar duties and responsibilities pursuant to a finite task list.

[15]    The Supreme Court has granted review of a decision heavily relied upon by the trial court in denying class certification. (See *Duran v. U.S. Bank National Assn.* (2012) 203 Cal.App.4th 212, review granted May 16, 2012, S200923.) One of the issues presented in *Duran* is the validity of using statistical surveys to establish liability.

8

party seeking class certification must establish (1) "the existence of an ascertainable and sufficiently numerous class"; (2) "a well-defined community of interest"; and (3) "substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker, supra,* 53 Cal.4th at p. 1021.) The community of interest requirement in turn requires three additional inquiries: (1) whether common questions of law or fact predominate; (2) whether the class representatives have claims or defenses typical of the class; and (3) whether the class representatives can adequately represent the class. (*Ibid.*)

"The certification question is 'essentially a procedural one'" (*Sav-on, supra,* 34 Cal.4th at p. 326) that examines "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment" (*id.* at p. 327). A certification motion "'does not ask whether an action is legally or factually meritorious' [citation]," but rather whether the common issues it presents "'are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'" (*Id.* at p. 326; see *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 507 ["the central issue in a class certification motion is whether the questions that will arise in the action are common or individual, not plaintiffs' likelihood of success on the merits of their claims"].) The court must assume the class claims have merit and resolve disputes regarding the claims' merits only when necessary to determine whether an element for class certification is satisfied. (*Brinker, supra,* 53 Cal.4th at pp. 1023-1025.) "'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Id.* at pp. 1021-1022; see also *Sav-on,* at p. 334 ["'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate'"].)

A trial court is generally afforded great latitude in granting or denying class certification, and we normally review a ruling on certification for an abuse of discretion. (*Sav-on, supra,* 34 Cal.4th at pp. 326-327; see *Brinker, supra,* 53 Cal.4th at p. 1022

9

["'[b]ecause trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification'"].)  This deferential standard of review, however, is inapplicable if the trial court has evaluated class certification using improper criteria or an incorrect legal analysis:  "[A] trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made.'"  (*Sav-on,* at pp. 326-327; accord, *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089; *Ghazaryan v. Diva Limousine, Ltd., supra,* 169 Cal.App.4th at p. 1530.)  In conducting our review, we "'must examine the trial court's reasons for denying class certification.'  [Citation.]  . . . [We] 'consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial.'"  (*Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1297-1298; accord, *Benton, supra,* 220 Cal.App.4th at p. 716.)

2. *The Class Is Adequately Represented by Plaintiffs, Whose Claims Are Typical of the Class*

Although the questions whether a plaintiff has claims typical of the class and will be able to adequately represent the class members are related, they are not synonymous.  The typicality requirement's purpose "'is to assure that the interest of the named representative aligns with the interests of the class.  [Citation.]  "'Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.'"  [Citations.]  The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."'"  (*Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1502.)  A class representative who does not have a claim against the defendants cannot satisfy the typicality requirement.  (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 98.)

"The adequacy of representation component of the community of interest requirement for class certification comes into play when the party opposing certification

brings forth evidence indicating widespread antagonism to the class suit." (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 696; see *J.P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 212 ["'[t]he adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent'"].) "To resolve the adequacy question the court 'will evaluate "the seriousness and extent of conflicts involved compared to the importance of issues uniting the class; the alternatives to class representation available; the procedures available to limit and prevent unfairness; and any other facts bearing on the fairness with which the absent class member is represented."'" (*Capitol People First*, at p. 697, quoting *J.P. Morgan & Co.,* at p. 213.) A party's claim of representative status will only be defeated by a conflict that "'goes to the very subject matter of the litigation . . . .'" (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470.)

Citing the identical rationale for finding plaintiffs' claims were not typical of the class and, consequently, they would not be adequate class representatives, the trial court stated plaintiffs' claims would be "vulnerable to the defense that each of them performed exempt tasks more than 50% of their work time. This contrasts with the putative class members who [allegedly] spent more than 50% of their work time performing non-exempt tasks."

With respect to typicality, this analysis suffers from an overly focused examination of the facts that looked toward individual differences rather than commonality. In essence, the trial court resolved the factual conflict between plaintiffs' declarations, in which they stated nonexempt tasks routinely occupied more than 50 percent of their time, and their deposition testimony that they could not estimate the number of hours they spent on individual tasks because those tasks varied day to day. The inability of the witnesses to specify time spent on particular tasks is hardly surprising, however, and does not create an issue that must be resolved on a motion for class certification. What was common to plaintiffs, in addition to the standard policies implemented by CAI at each of their restaurants, were their assertions their tasks did not change once they became managers; they performed a utility function and routinely filled

11

in for hourly workers in performing nonexempt tasks; and they worked far in excess of 40 hours per week without being paid overtime wages. Their claims—and the defense of executive exemption to those claims—are thus typical of the class. (*See Sav-on, supra,* 34 Cal.4th at pp. 336-337.)[16]

The larger problem with the adequacy of plaintiffs to represent the class as defined arises from the antagonism voiced by general managers, who overwhelmingly opposed the litigation. Again, this conflict is not unexpected: A general manager is hardly likely to share the duties of assistant managers, many of whom worked exclusively as kitchen- or front-managers. CAI stresses the fact that JCS restaurants vary in size and volume and were staffed according to need by three to seven managers. It is not hard to conceive that the lower the rung occupied by a particular manager the more likely he or she is to engage in tasks common to the hourly employee. This apparent conflict, however, is not fatal. In the interest of preserving the claims of subordinate managerial employees, the trial court may on remand exercise its discretion to create a general managers subclass or to exclude general managers entirely from the class definition. (See, e.g., *Richmond v. Dart Industries, Inc.*, *supra,* 29 Cal.3d at pp. 470-471 [class action need not be dismissed when trial court can use subclasses to remove any antagonism among members of the putative class]; *Medrazo v. Honda of North Hollywood, supra,* 166 Cal.App.4th at p. 99 [when class representative's """"interests are antagonistic to or in conflict with the objectives of those [s]he purports to represent'" [citation], . . . court should determine if it would be feasible to divide the class into subclasses to eliminate the conflict and allow the class action to be maintained"]; *Capitol People First v. State Dept. of Developmental Services, supra,* 155 Cal.App.4th at p. 697 ["where factual circumstances differ, or class members disagree as to the proper theory of liability, the trial judge, through resort to subclasses, intervention, and the like, may incorporate class differences into the litigation process and afford all members their due in deciding the proper outcome"]; *Aguiar v.*

---

[16]     The inquiry into typicality necessarily requires the issues to be framed with attention to the commonality between plaintiffs and the putative class, rather than the individual differences among them. (See fn. 19, below.)

12

*Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 133 ["[t]he use of subclasses is an appropriate device to facilitate class treatment"].)[17]

   3. *The Trial Court Failed To Assess Means by Which Plaintiffs' Theory of Recovery Could Be Proved Through Resolution of Common Questions of Fact and Law*

In *Benton, supra,* 220 Cal.App.4th 701, we considered whether a proposed class of cell-phone tower technicians asserting meal and rest break violations and failure to pay overtime could establish the employer's liability through common proof.[18] We based our analysis on the Supreme Court's decision in *Brinker, supra,* 53 Cal.4th 1004, in which the Court granted review "to resolve uncertainties in the handling of wage and hour class certification motions." (*Id.* at p. 1021.) In keeping with the Court's rationale in *Brinker*, we reversed the trial court's order denying class certification because we concluded individual issues of proof did not predominate over common issues in assessing whether the defendants' meal period and rest break policies were valid under California law. (See *Benton,* at pp. 725-726.) Quoting another post-*Brinker* decision (*Faulkinbury v. Boyd & Associates* (2013) 216 Cal.App.4th 220), we stated, "'the employer's liability arises by

---

[17] The trial court did not identify any additional basis for its findings on typicality and adequacy, but the record contains evidence Martinez received overtime wages during a portion of the period he alleges he was a salaried manager and Saldana was terminated for altering time records. On remand the court may consider whether this evidence compromises the ability of either plaintiff to represent the class. (See *Seastrom v. Neways, Inc., supra,* 149 Cal.App.4th at p. 1502 ["named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representation is preoccupied with defenses unique to it'"].)

[18] In *Benton* the employer, Telecom Network Specialists (TNS), provided personnel services to the telecommunications industry and either hired employees directly or retained them through staffing agencies. Plaintiff, a contractor technician, alleged TNS had failed to ensure its staffing agencies complied with wage and hour laws and sought to certify a class of contractor technicians. The complaint alleged there were "'numerous questions of law and fact common to the [class],' including, in part: '[w]hether TNS was the employer of the [c]lass [m]embers'; '[w]hether TNS provided meal [and rest] breaks in accordance with California law'; and '[w]hether the [c]lass [m]embers were denied premium wages for overtime worked in violation of California law.'" (*Benton*, *supra,* 220 Cal.App.4th at pp. 706.)

13

adopting a uniform policy that violates the wage and hour laws. Whether or not the employee was able to take the required break goes to damages, and "[t]he fact that individual [employees] may have different damages does not require denial of the class certification motion." " (*Benton,* at p. 726, quoting *Faulkinbury,* at p. 235; see also *Bradley v. Networkers Internat. LLC* (2012) 211 Cal.App.4th 1129, 1151 (*Bradley*) ["[u]nder the logic of [*Brinker*], when an employer has not authorized and not provided legally required meal and/or rest breaks, the employer has violated the law and the fact that an employee *may* have actually taken a break or was able to [take a break] during the workday does not show that individual issues will predominate in the litigation"].)

We extended this rationale to the claim for overtime compensation. We reasoned the trial court had "failed to evaluate whether plaintiffs' theory of recovery could be proved (or disproved) through common facts and law" (*Benton, supra,* 220 Cal.App.4th at p. 731) and had apparently concluded each technician would be required to make an "individualized showing that he or she incurred overtime" (*ibid.*). As we explained, however, "Those issues . . . relate to the existence and amount of each technician's damages." (*Ibid.*; see also *Bradley, supra*, 211 Cal.App.4th at p. 1155 [certification was proper despite evidence that "the amount of overtime pay damages potentially due each class member [would] require[] individualized analysis because the number of hours worked each day was not uniform"].)

Admittedly, the overtime exemption claim in this case differs from the overtime claims in *Benton* and *Bradley*; nonetheless, it raises similar questions of proof. Rather than engage in a post hoc calculation for each employee of hours worked in excess of the mandated 40-hour work week, the factfinder here will ultimately have to decide whether CAI and Landry properly classified the members of the class as exempt from overtime pay requirements. Defendants contend this is a question of liability rather than damages and assert individual mini-trials will be required to establish whether each member of the class was properly treated as exempt.

The trial court, however, by accepting defendants' argument and focusing on the employer's affirmative defense of exemption failed to consider *Sav-on's* explicit

direction on issues of proof in such cases: "Any dispute over 'how the employee actually spends his or her time' [citation] . . . has the potential to generate individual issues. But considerations such as 'the employer's realistic expectations' [citation] and 'the actual overall requirements of the job,' [citation] are likely to prove susceptible of common proof." (*Sav-on, supra,* 34 Cal.4th at pp. 336-337; see *Sotelo v. Medianews Group, Inc.* (2012) 207 Cal.App.4th 639, 654 ["[a] class . . . may establish liability by proving a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will work overtime hours without overtime pay, or to miss rest/meal breaks"].) Thus, *Sav-on* instructs courts in overtime exemption cases to proceed through analysis of the employer's realistic expectations and classification of tasks rather than whether the employee can identify in retrospect whether, at a particular time, he or she was engaged in an exempt or nonexempt task. (*Sav-on*, at p. 330 ["task classification is a mixed question of law and fact appropriate for a court to address separately from calculating the amount of time specific employees actually spend on specific tasks"].)[19] For instance, the *Sav-on* Court observed the defendant had "allegedly promulgated exempt job descriptions, but implemented policies and practices that failed

---

[19]     As we explained in *Ghazaryan v. Diva Limousine Ltd., supra,* 169 Cal.App.4th 1524, "The record before the trial court on the class certification motion established . . . that individual drivers accumulate gap time at varying rates and utilize that time in different ways. But the record also reveals Diva dictates to a large extent how drivers use their on-call time. Diva distributes an official "Chauffeur's Handbook" to all drivers, which expressly bars personal use by drivers of Diva's vehicles (albeit Diva appears to ignore incidental errands within a geographically proximate area), requires drivers to respond promptly to dispatch calls and accept trip assignments absent pre-arranged circumstances, requires drivers to be in full uniform while in or proximate to their vehicles, and requires drivers to clean and maintain their vehicles during their on-call time. Those limitations apply across the board to all drivers who have on-call time during the course of a day. Although individual testimony may be relevant to determine whether these policies unduly restrict the ability of drivers as a whole to utilize their on-call time for personal purposes, the legal question to be resolved is not an individual one. To the contrary, the common legal question remains the overall impact of Diva's policies on its drivers, not whether any one driver, through the incidental convenience of having a home or gym nearby to spend his or her gap time, successfully finds a way to utilize that time for his or her own purposes." (*Id.* at p. 1536, fn. omitted.)

15

to afford its [managerial employees] true managerial discretion, and standardized store operations so that managers were obliged to spend over 50 percent of their time doing the same tasks as their subordinates." (*Id.* at p. 337.) Indeed, *Sav-on* recognizes that focusing on an employee's ability to individually reconstruct the time spent on particular tasks improperly shifts the burden of proving the executive exemption from the employer to the employee. (*Id.* at pp. 337-338.)[20]

The trial court's failure here to focus on the impact of JCS policies and practices on its managerial employees essentially shifted the burden of disproving the executive exemption to plaintiffs. Indeed, although the court recognized the evidence established the existence of a finite task list that could aid in the identification of common issues among the putative class members, its analysis effectively omitted any consideration of this potential class-wide proof.

A recent decision from our colleagues in Division Two of this court simplifies this endeavor and illustrates the enormous cost of resolving these claims on an individual, rather than a class-wide basis. (See *Heyen v. Safeway Inc.* (2013) 216 Cal.App.4th 795

---

[20]  "Contrary to defendant's implication, our observation in *Ramirez* [*v. Yosemite Water Co., Inc.* (1999) 20 Cal.4th 785] that whether the employee is an outside salesperson depends 'first and foremost, [on] how the employee actually spends his or her time' (*Ramirez,* [at p. 802]) did not create or imply a requirement that courts assess an employer's affirmative exemption defense against every class member's claim before certifying an overtime class action. [¶] Moreover, defendant's proposed reading of *Ramirez* would require, essentially, that a certification proponent in an overtime class action prove the entire class was nonexempt whenever a defendant raises the affirmative defense of exemption. But in *Ramirez* itself we recognized that 'the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption.' [Citations.] Were we to require as a prerequisite to certification that plaintiffs demonstrate defendant's classification policy was, as the Court of Appeal put it, either 'right as to all members of the class or wrong as to all members of the class,' we effectively would reverse that burden. *Ramirez* is no authority for such a requirement, nor does the logic of predominance require it." (*Sav-on, supra,* 34 Cal.4th at pp. 337-338.)

16

(*Heyen*).)[21] After reviewing analogous regulations for mercantile workers, *Heyen* articulated the appropriate manner of evaluating an employer's duties: "Several general principles emerge from these regulations. First, work of the same kind performed by a supervisor's nonexempt employees generally is 'nonexempt,' even when that work is performed by the supervisor. If such work takes up a large part of a supervisor's time, the supervisor likely is a 'nonexempt' employee. [Citations.] [¶] Second, the regulations do not recognize 'hybrid' activities—i.e., activities that have both 'exempt' and 'nonexempt' aspects. Rather, the regulations require that each discrete task be separately classified as *either* 'exempt' or 'nonexempt.' [Citations.] [¶] Third, identical tasks may be 'exempt' or 'nonexempt' based on the purpose they serve within the organization or department. Understanding the manager's purpose in engaging in such tasks, or a task's role in the work of the organization, is critical to the task's proper categorization. A task performed because it is 'helpful in supervising the employees or contribute[s] to the smooth functioning of the department' is exempt, even though the identical task performed for a different, nonmanagerial reason would be nonexempt. [Citations.] [¶] Finally, in a large retail establishment where the replenishing of stocks of merchandise on the sales floor 'is customarily assigned to a nonexempt employee, the performance of such work by the manager or buyer of the department is nonexempt.' [Citation.] Similarly, in such a large retail establishment, a manager's participation in making sales to customers is nonexempt, unless the sales are made for 'supervisory training or demonstration purposes.'" (*Id.* at pp. 822-823.)

Applying these principles to the tasks identified by CAI and Landry's, inventory, restocking, serving, cooking, bussing tables, cleaning and other tasks ordinarily performed by nonexempt employees remain nonexempt when performed by a managerial employee. Likewise, when a managerial employee fills in for a nonexempt employee, the

---

[21] Like plaintiffs here, Linda Heyen had sought certification of a class of assistant managers who allegedly had been improperly classified as exempt employees. Her claim was tried individually after the trial court's denial of class certification. (*Heyen, supra,* 216 Cal.App.4th at p. 799.)

17

task remains nonexempt.  On the other hand, if the managerial employee is performing the task for the purpose of supervisory training or demonstration, the task is exempt.  California law does not recognize a hybrid category in which the employee is deemed to be performing an exempt task at the same time he or she is performing a nonexempt task.  (*Heyen, supra,* 216 Cal.App.4th at p. 826.)[22]

As in *Heyen*, the gist of plaintiffs' claim here is that regardless of the patina of managerial discretion expressed in their job description, they functioned consistently as utility workers, cross-trained in all tasks, who could be assigned to fill in where needed without affecting the labor budget or requiring overtime compensation.  Assessing whether modes of proof exist that will allow common resolution of these claims does not require that we evaluate whether plaintiffs are likely to prevail on those claims.  Indeed, the trial court's rejection of the statistical evidence proffered by plaintiff's expert is essentially flawed because it imputes to that evidence a weight it need not bear.  Rather than constrain a factfinder, such evidence is simply an additional mode of proof of the essential question whether CAI's and Landry's policies exploited subordinate managers.  (Cf. *Mora v. Big Lots Stores, Inc., supra,* 194 Cal.App.4th at pp. 509-510 [trial court did not abuse its discretion by considering observational survey proffered by defendants to refute plaintiff's theory of misclassification]; see also *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 750 [statistical sampling in an overtime class action "does not dispense with proof of damages but rather offers a different method of proof"].)[23]  In

---

[22]  We recognize, of course, that an inquiry into whether a task is "helpful in supervising the employees or contribute[s] to the smooth functioning of the department" is nearly impossible in hindsight.  That is true, however, whether the question is raised as an issue common to a class of employees or in an individual proceeding.  The more accurate question is whether the employer's realistic expectations and the actual requirements of the job caused the employees to exercise supervisorial discretion or instead required them to play the utility role described above.

[23]  On remand the court should consider whether plaintiffs' proposed sampling plan qualifies as an aid in proof of class-wide liability rather than as a proxy or substitute for more traditional modes of proof.  (See *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 998, 1000 ["[w]e have found no case, and [plaintiff] has cited none,

18

other words, even if there were individual managerial employees whose work remained more than 50 percent managerial in nature, if CAI's and Landry's policies as implemented across California resulted in managerial employees being undercompensated for performing exempt work, class relief is appropriate.

4. *The Trial Court Must Reconsider Whether Class Certification Provides a Superior Method of Resolving Plaintiffs' Claim*

We have not ignored the substantial case authority, including our own, upholding trial court decisions not to certify class actions for claims similar to those raised here (see, e.g., *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974; *Mora v. Big Lots Stores, Inc., supra,* 194 Cal.App.4th 496; *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723); nor do we express any disagreement with the outcome of those cases. However, we understand from *Brinker, supra,* 53 Cal.4th 1004, a renewed direction that class-wide relief remains the preferred method of resolving wage and hour claims, even those in which the facts appear to present difficult issues of proof. By refocusing its analysis on the policies and practices of the employer and the effect those policies and practices have on the putative class, as well as narrowing the class if appropriate, the trial court may in fact find class analysis a more efficient and effective means of resolving plaintiffs' overtime claim.

---

where a court has deemed a mere proposal for statistical sampling to be an adequate evidentiary *substitute* for demonstrating the requisite commonality, or suggested that statistical sampling may be used to manufacture predominate common issues where the factual record indicates none exist"; "[a] trial court does not err in rejecting a proposed statistical sampling procedure when the class action proponent fails to 'explain how the procedure will effectively manage the issues in question'"].)

19

## DISPOSITION

The order denying class certification is reversed, and the cause is remanded for proceedings not inconsistent with this opinion.  Plaintiffs are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

WOODS, J.

SEGAL, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/4/13

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROBERTO MARTINEZ et al., | B242807 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC377269) |
| v. | |
| JOE'S CRAB SHACK HOLDINGS et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | |

THE COURT:

The opinion in this case filed November 12, 2013 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the non-parties' requests pursuant to California Rules of Court, rule 8.1120(a) for publication are granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.              WOODS, J.              SEGAL, J. (Assigned)